GRISBAUM, Judge.
This appeal concerns personal injuries sustained in an accident involving a shrimping vessel and an overhead electrical power line. We affirm.

ISSUE

The threshold question presented is whether the trial court erred in finding the defendant, Louisiana Power & Light Company (LP & L), negligent.

BASIC RECORD FACTS AND PROCEDURAL HISTORY

This matter was previously before our Court on an issue of summary judgment. Bourgeois v. La. Power & Light Co., 556 So.2d 1292 (La.App. 5th Cir.1990), writ denied, 563 So.2d 877 (La.1990). The facts were accurately set forth as follows:
Barry Bourgeois, captain of the commercial fishing vessel, Captain Barry, and deckhand [sic] Carlton Santiny set out from the bay side of Grand Isle in the afternoon of May 9, 1988 to shrimp. They navigated east, around the Gulf side of Grand Isle and proceeded to Ca-minada Pass. It was necessary for the Captain Barry to take the longer route around because the clearance between the water and a fixed bridge at the west end of the island on Louisiana Highway 1 would not permit safe passage for the vessel. An aerial power line[,] maintained by LP & L[,] crossed the mouth of Caminada Pass on the gulf side of the bridge.
When they arrived at the Pass, about 6:00 p.m., the two men laid anchor on the gulf side of the power line and waited for night-fall to begin shrimping operations. They shrimped until about midnight. Because the power line was also the demarcation used by the Wildlife and Fisheries for the division of open shrimping areas, the Captain Barry was anchored about fifteen feet from the line for the night. When anchor was set the tide was receding, moving the vessel away from the line. However, while the crew slept, the tide changed[,] and the vessel drifted the extent of the anchor rope bringing the vessel under the line. When the men awoke at about 8:00 a.m. they discovered they were on the bay side of the power line at rising tide.
Plaintiff started the motor and navigated the Captain Barry back out toward the Gulf. The antenna on top of the mast of the Captain Barry either came in contact with or got close enough to the line to receive an arc of electricity which sent high voltage to ground through the vessel’s radio[,] causing an explosion and fire in the cabin of the Captain Barry. Plaintiff, who was at the helm, was seriously injured.
Id. at 1293-94.
A bench trial on the merits was held in September 1991. The trial court, finding the plaintiff to be 66 and ⅜ percent at fault and the defendants 33 and ½ percent at fault, entered judgment in favor of the plaintiff in the amount of $216,745.33, a sum representing $650,236 of total damages proportionately reduced by the plaintiff’s degree of fault. The judgment also *308 cast LP & L liable for court costs, expert witnesses, and legal interest. It is from this judgment that LP & L has appealed.

ANALYSIS

In a previous decision of this matter, a panel of this Court determined that this case falls within admiralty jurisdiction. Bourgeois, supra. Our Court stated therein that
[sjuch jurisdiction is proper when a tort occurs on the high seas or on navigable waters and the plaintiff can show that the wrong “bears a significant relationship to traditional maritime activity.” ... In the instant case, the accident occurred at the mouth of Caminada Bay, a navigable waterway, while plaintiff was engaged in commercial shrimping activity. Thus, both the situs and nexus requirements for admiralty jurisdiction are met.
Id. at 1294 (citations omitted).

LAW

In applying the doctrine of the “law of the case,” by which an appellate court will not reconsider earlier rulings in the same case on a subsequent appeal, Board of Levee Comm’rs of Orleans Levee Dist. v. Newport Ltd., 578 So.2d 191 (La.App. 4th Cir.1991), writ denied, 584 So.2d 681 (La.1991), writ denied, 584 So.2d 683 (La.1991), we are bound by our previous findings. We, therefore, must decide this case under the substantive federal law of admiralty.
The United States Supreme Court has stated that “there is no doubt that the United States possesses the power to control the erection of structures, in navigable waters.” United States v. Appalachian Elec. Power Co., 311 U.S. 377, 405, 61 S.Ct. 291, 298, 85 L.Ed. 243 (1940). This power arises from the commerce clause of the Constitution, art. I, § 8, cl. 3, which has long been interpreted by the courts to necessarily include the power over navigation. Id. 311 U.S. at 405-06, 61 S.Ct. at 298.
In accordance with this power to control obstructions of navigable waters, 33 U.S.C. 403 provides as follows:
The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
Pursuant to this authority, the United States Army Corps of Engineers on June 4, 1969 issued a permit to LP & L to “install and maintain an aerial crossing for electric power lines, across Caminada Pass,” which was, by the permit, required to have a clearance height of not less than 38 feet above mean sea level. In 1970, the construction of the power line by LP & L was completed.
Mr. Leonard C. Quick, the plaintiff's expert, stated that the lowest point of the sag in the power line was 38 feet, 1 inch whereas Mr. Charles M. Camp, the expert for LP & L, testified that the lowest point in the line was 39.6 feet. The trial court found that “Mr. Camp was more believable” and, therefore, implicitly accepted that the line’s height was 39.6 feet.
It is well-settled that “the trial court’s determination of the credibility of the witnesses is entitled to great weight and should not be disturbed on appellate review unless manifestly erroneous....” Guy T. Williams Realty, Inc. v. Shamrock *309 Constr. Co., 564 So.2d 689, 694 (La.App. 5th Cir.1990), writ denied, 569 So.2d 982 (La.1990) (citation omitted). After carefully reviewing the testimony of these two experts, we cannot say that the trial court was clearly wrong. We, therefore, conclude that the height of the power line clearly met with the requirements of the Corps of Engineers’ permit.
Notwithstanding the fact that LP & L satisfied the height requirements of its permit, the trial court found that LP & L was negligent and 33 and ½ percent at fault in the accident. In its Reasons for Judgment, the trial court stated
On the other hand, LP & L was negligent in its actions and its actions were a proximate cause and a cause in fact of the injuries and damages sustained by plaintiff. Defendant was not in compliance with its permit. There was no warning of the voltage on the power-line poles. The inspection of the lines by sight from the bridge was inadequate. Additionally, this was a high water-traffic area and similar accidents had occurred in the past, of which defendant knew or should have known. Defendant created an interference to navigation.
With due regard to our appellate standard of review, i.e., manifest error, we agree with the trial court’s finding that LP & L was negligent and, therefore, liable for Mr. Bourgeois’ injuries.
At the outset, we note that LP & L did comply with certain parts of its permit. Accordingly, these references by the trial court in its Reasons for Judgment, to be discussed below, are inconsistent with the law and the evidence adduced at trial.

VOLTAGE WARNINGS

Initially, the trial court found LP & L at fault in not posting warnings of the power line’s voltage on its poles. The record does, indeed, reflect that no signs indicated the line’s height or voltage. However, the record also shows that the signs on the poles did read “Danger. Keep Off.” Furthermore, a warning on the plaintiff’s antenna stated “DANGER. WATCH FOR WIRES. YOU COULD BE KILLED if this antenna comes near electrical power lines.”
The testimony adduced at trial reveals that the plaintiff, who had never shrimped in this area, did have a chart on his boat indicating that the line’s height was 37 feet, but that he did not refer to the chart that day nor check with anyone about the line.
Captain John Mundy, accepted by the court as an expert in, inter alia, the field of navigation, the prudence of good seamanship, and the interpretation of aids to navigation, testified that all vessels are subject to the “Rules of the Road,” 33 U.S.C. § 201 et seq. The United States Supreme Court has stated that these rules are, indeed, applicable to all vessels regardless of their commercial or non-commercial nature. Foremost Ins. Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).
Thus, as Captain Mundy testified, these “Rules of the Road” place an obligation on seamen to follow ordinary practices of good seamen. As he also stated, the U.S. Coast Pilot, a book which acts as an aid to navigation, by which mariners are bound, makes reference to the instant power line, states its clearance as 37 feet, and advises that the area is not recommended for strangers.
Importantly, Captain Mundy stated that overhead power cables are printed on charts and that there is no requirement by the Coast Guard that signs be placed on lines themselves. Additionally, we note that the Corps of Engineers’ permit has no requirement of placing warning signs on the power line. We, therefore, conclude that LP & L’s failure to post warnings signs does not impart liability.

INSPECTION OF THE LINE

Next, the trial court found that LP & L’s “inspection of the lines by sight from the bridge was inadequate.” This finding is undoubtedly based on the testimony of Mr. Merlin J. Grow, an LP & L employee stationed in Grand Isle. Mr. Grow stated that he would inspect the lines from a bridge in Grand Isle about a quarter of a mile away from the line.
We pretermit any discussion on the sufficiency of the inspection, since no physical *310 defect in the line, discoverable by proper inspection, was alleged nor proven. The only relevance such an inspection could have is to prove that the line was not in technical compliance with its permit. As we have already determined that the line met the height requirements of the permit, we find the inspection, or lack thereof, irrelevant.

PERMIT COMPLIANCE

Next, we turn to LP & L’s compliance with Section (k) of the permit, which provides, “The permittee shall promptly comply with any future regulations or instructions affecting the work hereby authorized if and when issued in accordance with law by any Department of the Federal Government for the aid or protection of aerial navigation.”
The trial court made no specific finding on this particular issue. The plaintiff contends that the line did not meet the minimum requirements of “future regulations,” namely, the National Electric Safety Code (NESC), which requires a clearance of 42 feet.
As the plaintiff correctly points out, the NESC has not been adopted as a safety standard by any law or ordinance, although it may be given probative value in determining whether a breach of duty has occurred. See Horton v. Valley Elec. Membership Corp., 461 So.2d 375 (La.App. 2d Cir.1984); Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.1983). That the NESC has not been adopted by the State, parish or any administrative body was confirmed by the proffered testimony of Mr. Frederick Brooks, an expert in electrical engineering and electrical accident reconstruction.
The future regulations referred to in Section (k) are those “issued in accordance with law by any Department of the Federal Government.” Because the NESC does not have the force of law, it is not included in the Section. Moreover, it is not clear that Section (k) is even applicable to this case, as it refers to regulations “for the aid or protection of aerial navigation.” This is clearly not a case involving aerial navigation. We, therefore, find no breach of Section (k).

SIMILAR ACCIDENTS; CONSTRUCTIVE KNOWLEDGE OF LP & L

Finally, we turn to the plaintiffs contention that LP & L violated Section (c) of the permit which provides “That there shall be no unreasonable interference with navigation by the work herein authorized.” The trial court found that LP & L did create an interference with navigation. We agree.
Importantly, we emphasize that not only did LP & L create an interference with navigation, it further created an unreasonable interference, as prohibited by Section (c). In so finding, we take note of the jurisprudence which indicates that a structure for which an Army Corps of Engineers’ permit has been issued is sanctioned as a structure lawful under 33 U.S.C. 403. See Pillsbury Co. v. Midland Enterprises, Inc., 715 F.Supp. 738 (E.D.La.1989); Thompson v. Consolidated Gas Elec. Light & Power Co., 111 F.Supp. 719 (D.Md.1953). Compliance with this statute, alone, does not end the inquiry; rather, we must consider the totality of the circumstances to determine whether LP & L nevertheless violated its permit.
The testimony elicited at trial clearly indicates that the power line in question poses a serious risk to boaters in the area. Mr. Donald Reboul, a commercial fisherman and shrimper who has shrimped in the area for 15 years, testified that, although he has not personally had any problems with the line, he has seen other boats hit it. Mr. Louis S. Miller, Jr., another commercial fisherman, testified that he hit the same wire that Mr. Bourgeois hit, which resulted in the explosion of his boat’s electronics. Additionally, Mr. Miller stated that he has seen between five to seven other boats hit the wire.
Testimony was also elicited from Mr. Webb Cheramie, Jr., a commercial fisherman of 35 years who shrimps in Caminada Pass almost every day. He testified that he has hit the power line twice, knows of eight to ten others who have also hit the line, and has witnessed four other acci *311 dents. Furthermore, Mr. Michael D. Frazier, who lives near the bridge and who can see the lines from his house, testified that he has seen one other person hit the line.
We note there is some question as to whether LP & L had actual knowledge of boats hitting the power line. There is evidence that the instant matter is the only incident in which a lawsuit was filed. However, Mr. Merlin J. Grow, an LP & L employee stationed at Grand Isle for 26 years whose duties included the maintenance of the power line, testified that he had second-hand knowledge of boats hitting the line. As such, it follows that LP & L had constructive knowledge that its power line had been struck on several occasions and presented a dangerous threat. Moreover, the unreasonable interference with navigation posed by this power line was heightened by the wire’s being uninsulated.
Thus, after carefully considering the facts and circumstances presented, we conclude that LP & L did violate a portion of its permit, namely, Section (c), in that the power line created an unreasonable interference with navigation in a highly trafficked area. Accordingly, the trial court did not commit manifest error in finding that LP & L “was not in compliance with its permit.”
We now turn to the plaintiffs contention that the trial court erred in applying collision law. Instead, the plaintiff urges that general tort principles apply. In its Reasons for Judgment, the trial court excerpted from the previous decision of this matter the following passages:
Under principles of federal maritime law a vessel which drifts into collision is presumed to be at fault. James v. River Parishes Co., Inc., 686 F.2d 1129 (5th Cir.1982). That presumption is a prima facie showing of negligence on the part of the moving vessel. Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5th Cir.1967). That presumption may be rebutted by the moving vessel by a preponderance of the evidence. James v. River Parishes Co., Inc., supra.
[[Image here]]
Although a plaintiffs contributory negligence can be considered as a mitigation of damages, it does not bar recovery. The applicable rule in admiralty is use of comparative negligence. Bubla v. Bradshaw, [795 F.2d 349 (4th Cir.1986) ].
Bourgeois, supra, at 1294, 1295.
While this is the only reference to collision law in the Reasons for Judgment, and the trial court’s further analysis fails to incorporate the doctrines outlined by applying the presumptions, we will nevertheless address this issue.
The plaintiff contends that collision law is inapplicable because there is simply no proof that the plaintiff’s antenna collided with LP & L’s power line. The plaintiff argues that the evidence supports a finding that, rather than actual contact, there was electrical arcing, which refers to the “jumping” of electricity from an electrical source to an object that comes in close proximity to the source. After reviewing the testimony of both the lay witnesses and the experts, we cannot say that the trial court’s finding of actual contact is manifestly erroneous. Thus, if, indeed, the trial court determined that a collision between the antenna and the line in fact took place, the record amply supports such a finding.

QUESTION OF THE PLAINTIFF’S NEGLIGENCE

Our jurisprudence indicates that, when a moving vessel collides with a fixed object, there is a presumption that the moving vessel was at fault, and this presumption suffices to make out a prima facie case of negligence against the vessel. Woods v. U.S., Dep’t of Transp., 681 F.2d 988 (5th Cir.1982); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5th Cir.1967). After carefully reviewing the record, we find that the plaintiff failed to overcome this presumption.
The plaintiff testified that, on the night before the accident or the early morning of the accident, he anchored his boat and then went to sleep. When he arose on the morning of May 10, he discovered that, because of a change in tide, his vessel had *312 changed positions and was now on the other side of the power line. He admitted that the power line was plainly visible and that he had seen it when he anchored the boat; however, he thought he could pass underneath it.
Although the plaintiff knew that the power line was a source of “a lot of volts” and he did not know the line’s height, nor did he check with LP & L or consult charts indicating the clearance of the line. Instead, since he could not see his antenna from his position (inside the cabin), he placed his deck hand to watch so that he could avoid the line. Importantly, the plaintiff testified that he could have taken the antenna down to get under the line.
Mr. Carlton Santiny, the deck hand, testified that he and the plaintiff never discussed lowering the antenna. He confirmed that neither he nor the plaintiff referred to any charts aboard the vessel before attempting to pass underneath the line. In his deposition, Mr. Santiny testified that he knew the antenna was higher than the power line and had warned the plaintiff of this fact. He also repeated this fact on the morning of the accident.
As previously stated, Captain Mundy testified that the “Rules of the Road” require that all seamen follow ordinary practices of good seamen. He enumerated the following breaches on the part of the plaintiff of this obligation: not keeping and consulting with adequate charts on the vessel, not knowing the height of the antenna when in close proximity of an overhead power cable, not selecting a good anchoring position, not posting an anchor watch to assure that the vessel did not drift, and not unbolting the antenna when attempting to pass under the power line.
The trial court found the plaintiff to be 66% percent at fault in causing the accident. After a careful review of the record and the appropriate jurisprudence, we cannot say this finding is clearly wrong. Accordingly, the trial court’s judgment dated November 27, 1991 is hereby affirmed. The parties to this appeal are to bear their respective costs.

AFFIRMED.